UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

AILEEN ORMSBY *et al.*,

  Plaintiffs,

  v.                                         CAUSE NO. 3:19-CV-626 DRL

NEXUS RVS, LLC *et al.*,

  Defendants.

## OPINION AND ORDER

George and Aileen Ormsby wanted to purchase a recreational vehicle from Nexus RVs, LLC in 2017. They toured an Indiana-based Nexus factory, looked at a used recreational vehicle, and spoke with a Nexus sales manager about purchasing the unit. Nexus sent them to a Rowley White LLC dealership in Arizona to consummate a sale.

Meanwhile, the Ormsbys convinced their son to purchase the recreational vehicle through his company, Two J's Enterprises LLC. They did this to save taxes. The final bill of sale from the dealer identified Two J's as the buyer—and identified neither Nexus nor the Ormsbys as parties to the deal. The Ormsbys advanced their son's company the funds to purchase the unit. Later, after issues with the vehicle, the Ormsbys asked Nexus to revoke the contract. Nexus declined, and this suit followed.

Today Nexus and its sales manager request summary judgment on all claims brought by the Ormsbys and Two J's—implied warranty, express warranty, contract, common law fraud, and violation of the Arizona Consumer Fraud Act (ACFA), as well as a UCC-based revocation remedy. The court grants the motion.

## BACKGROUND

George and Aileen Ormsby, in the market to purchase a recreational vehicle, toured a Nexus factory in Elkhart, Indiana on October 6, 2017. Nexus East Coast Sales Manager David Lint gave the

tour. The Ormsbys said they wanted a smoother-riding recreational vehicle because of Ms. Ormsby's health. The Ormsbys test drove a Nexus Bentley. Mr. Lint informed the Ormsbys that a pre-owned Nexus Bentley (Class A) was under work in a separate warehouse and took them there to see it.

Mr. Lint informed the Ormsbys that the prior owner possessed the unit for four months, that it was returned because the prior owner wanted something bigger, that it was being reconfigured because the prior owner had put a desk in, that Nexus could change certain things for the Ormsbys at no cost because it was already dismantled, and that Nexus would perform a predelivery inspection. For modifications, Mr. Lint said Nexus would replace the current mattress with a king-sized mattress, change the upholstery color, restore all the original equipment, and replace the desk with the original sofa.[1] Mr. Lint recorded these changes on a change order form.

The Ormsbys and Nexus discussed a purchase price of $175,000. The Ormsbys "gave [Mr. Lint] a credit card, and [Mr. Lint] put $3,000 down as a down payment so that no one else would come in and buy the RV. We knew it was ours now," Ms. Ormsby testified. Mr. Ormsby similarly said, "We wanted to hold that unit so no one else would buy it. And as long as all the preconditions we discussed with [Mr. Lint] were satisfied, we would consider buying that unit." Nexus testified that the $3,000 would have been refunded if no purchase were made, but that request never came. The Ormsbys and Nexus never drew up a purchase agreement. No express written warranty was discussed for this used unit.

The Ormsbys did not want to travel back to Indiana to pick up the unit when it was complete due to bad weather. Nexus was no longer licensed to sell directly to consumers, as the company had moved to a dealer network, so the two sides pursued other options to facilitate a deal. Nexus lacked a dealer where the Ormsbys lived. The parties thus tried to have the unit delivered to one dealership, but

---

[1] Nexus cites a David Lint deposition in opposition [*see* ECF 101 at 29], but no such deposition seemingly has been submitted to the court.

this plan fell through. Instead, the parties decided to use a separate dealership—Rowley White RV, LLC in Phoenix, Arizona.

Rowley White had already entered into a dealership agreement with Nexus. Though the agreement was not so limiting, Rowley White says the dealership never agreed to sell Class A motorhomes. Nexus nonetheless called the dealer and asked it to "facilitate a deal for [Nexus] that [it] had made prior to [it] going wholesale when [it was] consumer direct." The dealer assumed this was a "consignment deal," but Rowley White never signed a consignment agreement with Nexus for this transaction. Rowley White told Nexus that it did not work on Class A motorhomes and could not perform a predelivery inspection, so Nexus agreed to arrange the inspection. Nexus promised to pay Rowley White $5,000 for processing the transaction, though Nexus never made the payment.

About two days after the conversation between Nexus and Rowley White, Nexus delivered the unit to the dealer. Nexus put the cost of the unit on Rowley White's credit line. This was done through the dealership agreement's floorplan financing, which allowed Nexus to place items on Rowley White's credit line without its approval. Though the dealership agreement seems not to specify this, it was Rowley White's understanding that floorplan financing would be used only for new recreational vehicles, not used ones.

Meanwhile, and seemingly without informing Nexus, the Ormsbys decided not to buy the unit themselves and instead discussed a purchase arrangement with their son and owner of Two J's Enterprises LLC. The Ormsbys agreed to advance the purchase money for Two J's to purchase the recreational vehicle. They wired $174,502 to the company on December 14, 2017. Two J's agreed to pay for storage and insurance. The Ormsbys wanted to avoid tax consequences.

Rowley White called the Ormsbys to schedule a walkthrough. On December 26, 2017, Two J's transferred $174,483 to Rowley White. The Ormsbys went to Rowley White to finalize the bill of sale on January 20, 2018. The bill of sale listed Two J's as the purchaser and Rowley White as the seller. The

Ormsbys testified that they structured the deal this way for tax purposes—again a sales tax could be avoided if Two J's purchased the recreational vehicle.

With a Rowley White representative watching, Ms. Ormsby crossed out "all used trailers are sold as is" and "sold as is initial" on the purchase bill of sale because a predelivery inspection had not yet been conducted. Another Rowley White representative testified that there are no records that one of its managers authorized this modification. The parties nevertheless proceeded with the bill of sale. Ms. Ormsby signed it for Two J's. Though not a member, director, or employee, she was ostensibly authorized by Two J's to sign the bill of sale for the company (both she and her son so testify, albeit not always consistently).

Rowley White performed a walkthrough, creating a punchlist of repairs. The Ormsbys coordinated the recreational vehicle's delivery with a Wagon Trail dealership in Nevada to avoid a $5,000 Arizona tax that would have applied had they possessed the unit in Arizona. Nexus asked Wagon Trail to perform the predelivery inspection. Wagon Trail performed the inspection; and, about two weeks later, delivered the unit to the Ormsbys.

The Ormsbys received the certificate of title in June 2018. The title listed Two J's as the owner and the Ormsbys as security interest holders/lessors. Ms. Ormsby, finding the name of the unit's prior owner after experiencing issues with it, called him. The prior owner reported that the recreational vehicle "was a junk. That's the only way to say it to you. Everything was falling apart on it." He returned the unit because it "was nothing but junk on six wheels."

The Ormsbys testified that the promises made by Nexus (Mr. Lint) were not kept, including the installation of a king-sized mattress, the changing of the upholstery color, and restoring the recreational vehicle to its original condition.[2] The Ormsbys say they never received a predelivery inspection form.

---

[2] For ease, the court refers to the defendants as Nexus, except when clarity requires separate mention of Mr. Lint.

They say the unit remains riddled with defects. On August 5, 2019, the Ormsbys sent Nexus a notice of revocation. Nexus declined to rescind the transaction. This suit followed.

## STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party must present the court with evidence on which a reasonable jury could rely to find in his favor. *Weaver v. Speedway, LLC*, 28 F.4th 816, 820 (7th Cir. 2022). The court must construe all facts in the light most favorable to the non-moving party, viewing all reasonable inferences in that party's favor, *Bigger v. Facebook, Inc.*, 947 F.3d 1043, 1051 (7th Cir. 2020), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003); *see also Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 924-25 (7th Cir. 2020).

In performing its review, the court "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Instead, the "court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Id.* The court must grant a summary judgment motion when no such genuine factual issue—a triable issue—exists under the law. *Luster v. Ill. Dep't of Corr.*, 652 F.3d 726, 731 (7th Cir. 2011).

## DISCUSSION

The court has both federal question and diversity jurisdiction. The MMWA provides a means to assert state law warranty claims in federal court, though the claims remain informed by state law. *See* 15 U.S.C. § 2310(d)(1); *Anderson v. Gulf Stream Coach, Inc.*, 662 F.3d 775, 781 (7th Cir. 2011); *Priebe v. Autobarn, Ltd.*, 240 F.3d 584, 587 (7th Cir. 2001). Separately, a court sitting in diversity applies Indiana's choice of law rules. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Ruiz v. Blentech Corp.*, 89 F.3d 320, 323 (7th Cir. 1996). Both sides argue Arizona law. Seeing no reason to apply another state's law, and presented

with no conflict that would require analysis, the court applies Arizona law. *See McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 684 (7th Cir. 2014); *Simon v. United States*, 805 N.E.2d 798, 805 (Ind. 2004).

        A.       *Real Party in Interest.*

Nexus argues that the Ormsbys should be dismissed because they are not the real parties in interest. Every action must be prosecuted in the name of the real party of interest. Fed. R. Civ. P. 17(a); *Weissman v. Weener*, 12 F.3d 84, 85 (7th Cir. 1993). "In determining the real party in interest, the key consideration is not who will ultimately benefit from the recovery, but rather who, by the substantive law, possesses the right sought to be enforced." *Wilmington Tr., N.A. v. 410 S. Main St. LLC*, 584 F. Supp.3d 689, 701 (N.D. Ind. 2022); *see also Checkers, Simon & Rosner v. Lurie Corp.*, 864 F.2d 1338, 1343 (7th Cir. 1988); 6A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1543 (2010). The purpose of this requirement is to "protect the defendant against a subsequent action by the party actually entitled to recover." *RK Co. v. See*, 622 F.3d 846, 850 (7th Cir. 2010).

The MMWA recognizes as the real "consumer" in interest "any other person who is entitled . . . under applicable [s]tate law to enforce against the warrantor . . . the obligations of the warranty," 15 U.S.C. § 2301(3); *see also* Ariz. Rev. Stat. §§ 47-2313, 47-2314. The ACFA permits a hearer of a false promise or misrepresentation made in connection with a sale to bring a claim against the speaker, if it caused injury to the hearer. Ariz. Rev. Stat. § 44-1522(A); *see Dunlap v. Jimmy GMC*, 666 P.2d 83, 87 (Ariz. Ct. App. 1983); *see also Taeger v. Cath. Fam. & Cmty. Servs.*, 995 P.2d 721, 730 (Ariz. Ct. App. 1999) (listing elements of common law fraud).

This Rule 17 defense must be timely asserted—understandably so, because often the parties can then address the issue early before the case has progressed to this point. The defense remains "subject to waiver" if not raised with "reasonable promptness." *RK*, 622 F.3d at 850. A district court has wide discretion to determine whether a Rule 17 objection is timely. *See id.* at 850-51.

Nexus argues that Two J's is the real party in interest. Nexus says the Ormsbys didn't purchase the unit and don't own it. Nexus argues its timeliness because Two J's is already joined in this action and because Nexus learned the information necessary to raise this issue in depositions with the Ormsbys a month before Nexus filed its motion. The Ormsbys say the argument is late. They contend that Nexus should have raised this point as an affirmative defense or in the company's 2019 motion to dismiss.

The Ormsbys have it right. The argument is untimely. This case began in August 2019; and, for three years, this defense was not raised. The defense was not seemingly pleaded in the answer (only joinder), nor in an amended answer. *See* Fed. R. Civ. P. 17(a)(3). The defense (though perhaps not affirmative) should be raised either in an answer or a motion to dismiss, not years later in a summary judgment motion after the basis for the motion has been known for some time. *See* 6A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1554 (2022).

Nexus argued in its 2019 motion to dismiss that no contract existed between the Ormsbys and Nexus and that a contract existed only with the dealer. If Nexus had the contract back then, the company had information to question whether the Ormsbys were the real parties in interest rather than just Two J's. Nexus has not said when it first received the certificate of title, but the court cannot imagine this document was not also acquired early. The July 2022 depositions seem only to have helped round out the arrangement between the Ormsbys and Two J's, but this defense presented in the record before now.

A "timely objection during the early stages of litigation would have uncovered" a problem with the real party in interest, if it was not already known. *RK*, 622 F.3d at 851. Nexus will not be prejudiced, as the argued real party in interest (Two J's) has been a party since the beginning—fulfilling the primary purpose of Rule 17 to shield Nexus from a future lawsuit. *See id.* at 850; *see also MJK Partners, LLC v. Husman*, 877 F. Supp.2d 596, 612 (N.D. Ill. 2012). After three years, the court finds this objection untimely and waived.

Even if the objection were timely, it does not address all claims in the lawsuit. For example, the Ormsbys need only have been harmed to bring a common law fraud claim, not have an ownership interest in the recreational vehicle. *See Taeger*, 995 P.2d at 730. The ACFA creates a similar cause of action in a hearer. *See Dunlap*, 666 P.2d at 87. The objection raised by Nexus today would not preclude the Ormsbys from bringing their claims. So for timeliness and the merits, the court must deny the Rule 17 request to dismiss.

B.      *Implied Warranties and the UCC-Based Revocation Remedy.*

"Under Arizona law, privity of contract is required to maintain an action for breach of an implied warranty." *Chaurasia v. GMC*, 126 P.3d 165, 171 (Ariz. Ct. App. 2006); *see Flory v. Silvercrest Indus. Inc.*, 633 P.2d 383, 387-88 (Ariz. 1981); *Bestwick v. Newmar Corp.*, 576 F. Supp.3d 599, 603 (N.D. Ind. 2021). An implied warranty inheres in a sale of goods under the Uniform Commercial Code (UCC). "In other words, Arizona law only provides for implied warranties by the seller in a given transaction, not by other parties that manufacture the goods being sold." *Reger v. Ariz. RV Ctrs., LLC*, 2017 U.S. Dist. LEXIS 132906, 5-6 (N.D. Ind. Aug. 21, 2017) (citing *Flory*, 633 P.2d at 388-89).

The UCC affords a buyer a revocation remedy when the product fails to conform with representations about its qualities or characteristics and this substantially impairs its value. Ariz. Rev. Stat. § 47-2608(A). To secure this remedy under the UCC, privity of contract must also exist. *See Seekings v. Jimmy GMC of Tucson, Inc.*, 638 P.2d 210, 214 (Ariz. 1981); *Chaurasia*, 126 P.3d at 172. The remedy must be pursued by a "buyer." *See* Ariz. Rev. Stat. § 47-2608(A); *see also* Ariz. Rev. Stat. § 47-2103(A)(1) (defining buyer). "The remedies associated with revocation of acceptance are intended to return the buyer and seller to their presale positions." *Seekings*, 638 P.2d at 214. That cannot be accomplished if a party other than the buyer seeks to revoke the transaction.[3] *See id.*; *Chaurasia*, 126 P.3d at 172.

---

[3] For instance, the parties could rescind the transaction after revoking acceptance; but, if the plaintiff seeking revocation wasn't the buyer with the ability to return the goods, rescission—the return of the parties to their

For these reasons, Nexus seeks summary judgment on the implied warranty claim and the UCC-based revocation remedy. Nexus points out that the dealer (Rowley White) entered into the sales contract with Two J's, not Nexus. Nexus thus argues that it never sat in privity with Two J's (the buyer), much less the Ormsbys (who financed the purchase). To combat this privity argument, the Ormsbys mount a two-fold defense—that they actually consummated the purchase in Indiana in October 2017, or alternatively that the dealer acted only as Nexus's agent in the sale.

No reasonable jury could find that Nexus and the Ormsbys consummated a recreational vehicle purchase in October 2017. The Ormsbys paid $3,000 to Nexus. This was a holding deposit only. Ms. Ormsby testified that they "put $3,000 down as a down payment so that no one else would come in and buy the RV" and, for that reason, she "knew it was [theirs] now." Mr. Ormsby testified that they "wanted to hold that unit so no one else would buy it." He said there was still more to come: "as long as all the preconditions discussed with [Nexus] were satisfied, [they] would *consider* buying that unit." He confirmed that they never signed a purchase agreement with Nexus. As a holding deposit, this payment at most preserved an option to purchase, but never constituted a purchase. *See Phipps v. CW Leasing, Inc.*, 923 P.2d 863, 866 (Ariz. Ct. App. 1996).

That leaves agency as the only avenue to establish privity. *See Seekings*, 638 P.2d at 214 (considering whether dealer was manufacturer's agent in selling motor home). The bill of sale identifies the dealer (Rowley White) as the seller and the son's company (Two J's) as the buyer—not Nexus and the Ormsbys [ECF 95-4]. No one has asked the court to reform the contract, *see, e.g.*, *Isaak v. Mass. Indem. Life Ins. Co.*, 623 P.2d 11, 14 (Ariz. 1981); *Patecell v. Cook*, 673 P.2d 33, 36 (Ariz. Ct. App. 1983), to view these other parties as third-party beneficiaries (if they even could), *see Norton v. First Fed. Sav.*, 624 P.2d 854, 856 (Ariz.

---

original situations—could not occur. Nor could a distant manufacturer who has not received the purchase price, like a seller, return the monies paid.

1981); Ariz. Rev. Stat. § 47-2318, or to find agency (or privity) by treating this really as a consignment deal, *see Com. Sec. Corp. Consol. v. Babbitt Motor Co.*, 286 P. 820, 822 (Ariz. 1930).[4]

Generally, a "contract between a foreign corporation and its local dealer, which merely obligates the former to sell to the latter, and the latter to purchase from the former for resale on his own account, clearly is only a sales agreement, and does not give rise to any agency relation." *Am. Motors Sales Corp. v. Superior Ct.*, 494 P.2d 394, 397 (Ariz. Ct. App. 1972). "[N]ormally dealers in new automobiles, although commonly spoken of as agents, are purchasers from the manufacturers, their only attribute as agents being authority to extend to the purchasers from them the limited warranty of the manufacturers." *Seekings v. Jimmy GMC, Inc.*, 638 P.2d 223, 225 (Ariz. Ct. App. 1981) *vacated in part on other grounds*, 638 P.2d 210 (Ariz. 1981).

The question is whether a reasonable jury could find that today's scenario falls outside this normal rule. Agency is "the fiduciary relation [that] results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other to so act." *Nava v. Truly Nolen Exterminating*, 683 P.2d 296, 299 (Ariz. Ct. App. 1984). "Reservation by the asserted 'principal' of the right to control the transaction is essential to the existence of an agency relationship." *Id.* This unusual record presents a triable issue whether Rowley White served as a selling agent for Nexus—though only on that side of the deal, and if the Ormsbys bought the unit.

---

[4] "[A] consignment of goods for sale does not pass the title to the consignee at any time, nor does it contemplate that it should be passed. The very term implies an agency, and that the title is in the consignor, the consignee being his agent for the purpose agreed between them; in this case, for a bona fide sale." *Babbitt Motor*, 286 P. at 822. "In ordinary commercial practice, a consignment is nothing more than a bailment for care or sale, wherein there is no obligation of purchase in the consignee." *In re D.I.A. Sales Corp.*, 339 F.2d 175, 178 (6th Cir. 1964). "A true consignment creates an agency pursuant to which goods are delivered to a dealer for the purpose of resale; the consignor usually requires the consignee to charge a certain price for the goods." *Glenshaw Glass Co. v. Ontario Grape Growers' Mktg. Bd.*, 67 F.3d 470, 475 (3d Cir. 1995). "A consignment of goods for sale does not pass the title at any time, nor does it contemplate that it should be passed." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 160 (2012). The bill of sale lists "sales, consignment, parts" above Rowley White. The dealer initially believed this would be a consignment sale, but never used consignment forms. The Ormsbys never argue privity through this lens, so the court declines to engage the subject.

An agency relationship may exist in several forms. "Actual authority includes both express authority outlined in specific language, and implied authority when the agent acts consistently with the agent's reasonable interpretation of the principal's manifestation in light of the principal's objective and other facts known to the agent." *Best Choice Fund, LLC v. Low & Childers, P.C.*, 269 P.3d 678, 687 (Ariz. Ct. App. 2011) (quotations omitted). "An apparent or ostensible agent is one where the principal has intentionally or inadvertently induced third persons to believe that such a person was his agent although no actual or express authority was conferred on him as agent." *Reed v. Gershweir*, 772 P.2d 26, 28 (Ariz. Ct. App. 1989). "[T]o establish apparent authority the record must reflect that the alleged principal not only represented another as his agent, but that the person who relied on the manifestation was reasonably justified in doing so under the facts of the case." *Id.* Agency also can be established through estoppel, and "the acts creating the estoppel must be done by the principal with knowledge or a reasonable ground for believing that the other party will rely thereon and change his position for the worse." *Phoenix W. Holding Corp. v. Gleeson*, 500 P.2d 320, 328 (Ariz. Ct. App. 1972).

The Ormsbys argue that a reasonable jury could use actual authority, apparent authority, or estoppel to find an agency relationship between Nexus and Rowley White. They argue that Nexus told them where to take delivery and transfer purchase funds. They say the dealer thought it was facilitating an already-completed deal and receiving $5,000 for its processing. Nexus lost its ability to sell direct to these consumers; and, aside from the dealer not being a Class A dealer, in its view its floorplan financing with Nexus involved only new recreational vehicles, not used units like this one. The vehicle's cost (over $170,000) nonetheless showed up on the dealer's credit line—a surprise to be sure, and its first indication that this wasn't a consignment deal.[5] The Ormsbys argue that Nexus dictated the purchase price, so the

---

[5] The dealer's representative testified that Nexus "asked us to facilitate a deal for them that they had made prior to them going wholesale when they were consumer direct when they had a dealership in Las Vegas. And they had made this deal months ago prior, and they needed somebody just to deliver the trailer for them because, since they were no longer consumer direct, they no longer had a dealer license out of Vegas to facilitate the paperwork. . . . And they said all you have to do is deliver this motorhome for us. And it was a consignment deal where it was

dealer had no choice but to sell the unit to recoup its assessment. Nexus counters that the dealer purchased the vehicle through its floorplan financing, just as its dealership agreement allowed.

A jury could reasonably conclude two things on this record—either Nexus gave authority for Rowley White to sell the unit to the Ormsbys or that Nexus gave no such authority (actually or apparently). The facts are in conflict. Nexus negotiated certain requirements of the sale, accepted a holding deposit, set the purchase price, made certain promises to the Ormsbys, identified to the Ormsbys the dealer to consummate the sale, controlled some measure of the delivery to the Ormsbys by specifying another dealer for the predelivery inspection, offered to pay Rowley White a $5,000 processing fee, and ultimately retained the value of the sale. Rowley White also testified that it was working outside its dealership agreement with Nexus and acting as selling agent for Nexus. These unusual facts, often not seen in consumer deals, would give a reasonable jury the basis to find that Rowley White acted as a selling agent for Nexus, either actually or apparently, in a sale with the Ormsbys. Just as reasonably, a jury could conclude that Nexus had not authorized Rowley White to serve as its agent in a sale of this recreational vehicle to the Ormsbys, particularly when Nexus never seemed to dictate other material terms of the deal, when Rowley White directed the use of specific paperwork and controlled what warranties to give or not to give, and given the new dealership agreement.

That said, even if the collage of facts creates a triable issue on one side of the privity relationship, they fail to draw Nexus into privity with the Ormsbys. The agency argument never explains why the Ormsbys prove absent as buyers. The bill of sale identifies only Two J's as the buyer. Neither the court nor the jury can add them. *See Goodman v. Newzona Inv. Co.*, 421 P.2d 318, 320 (Ariz. 1966). The Ormsbys

---

sold, it was a used one, and we were just delivering it for—we were making two parties happy by delivering this. . . . For the transaction, they promised to pay us $5,000. . . . [W]hen we received the invoice [for the unit], we didn't take that as we owe this money to Nexus. We took that as this is what we need to get paid for from the Ormsbys. . . . We didn't negotiate price. We didn't negotiate anything. That was already done previously to our involvement."

have not argued that Two J's served merely as their agent. There simply are no theories advanced to close the loop and establish privity between Nexus and the Ormsbys.

But to a reasonable jury could Nexus on this record stand in privity with Two J's? No—no one advised Nexus that the deal would involve Two J's. Two J's became involved only after the discussions between Nexus and the Ormsbys in October 2017. At most, Nexus authorized Rowley White to sell the unit to the Ormsbys. No evidence shows Nexus actually or apparently authorized a deal with Two J's. Two J's was a separate and independent entity from the Ormsbys. *See JTF Aviation Holding Inc. v. CliftonLarsonAllen LLP*, 472 P.3d 526, 530 (Ariz. 2020) ("concept of a corporation as a separate entity is a legal fact, not a fiction"). A reasonable jury could no easier find that Nexus and Two J's stood in privity than if the unit had been sold to any other stranger. Even if a reasonable jury could decide that the dealer acted as Nexus's agent to finalize a deal with the Ormsbys, the record remains devoid of any facts that would provide a jury a reasonable basis for saying the dealer had Nexus's actual or apparent authority to consummate a sale with Two J's.

A "principal is not liable on contracts which he has in no way authorized." *O.S. Stapley Co. v Logan*, 431 P.2d 910, 913 (Ariz. Ct. App. 1967). Even "to hold a principal liable for his agent's acts under an apparent authority theory, the third party must demonstrate that his reliance upon the agent's apparent authority was reasonable." *Anchor Equities v. Joya*, 773 P.2d 1022, 1026 (Ariz. Ct. App. 1989). And for estoppel, the "acts creating the estoppel must be done by the principal with knowledge or a reasonable ground for believing that the other party will rely thereon and change his position for the worse." *E-Z Livin' Mobile Homes v. Tommaney*, 550 P.2d 658, 662 (Ariz. Ct. App. 1976). Whatever could be said about what the Ormsbys may have been able to rely on to complete their deal, nothing Nexus said or did gave Two J's a reasonable belief that the manufacturer authorized a deal with Two J's. Nor did Nexus say or do anything that caused Two J's reliance, not on this record. There were no dealings between the two.

That said, privity is lacking, including through an agency theory. Neither the Ormsbys nor Two J's can pursue an implied warranty claim or secure the revocation remedy against Nexus. *See Chaurasia*, 126 P.3d at 171-72. The court leaves unanswered whether Two J's may have had a basis for pursuing Rowley White, and then whether Rowley White had a basis for pursuing Nexus, because the court dismissed Rowley White as a party for lack of jurisdiction. The court must grant summary judgment on this implied warranty claim and revocation remedy accordingly.

C.     *Express Warranty.*

An express warranty is created through "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain." Ariz. Rev. Stat. § 47-2313(A)(1). "It is not necessary to the creation of an express warranty that the seller use formal words such as 'warrant' or 'guarantee' or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty." Ariz. Rev. Stat. § 47-2313(B).

Nexus argues that the express warranty was for a predelivery inspection only, and the statement that "everything will be great" did not transform a used unit into a new unit with "bumper-to-bumper warranty into perpetuity." Nexus contends that this inspection promise did not promise that all defects would be caught or that the unit would be free of defects. Nexus says the Ormsbys received what was promised—a predelivery inspection, as Nexus helped coordinate through Wagon Trail.

The Ormsbys argue three breaches of express warranty. First, they argue that Nexus's statement (through Mr. Lint) that the prior owners returned the recreational vehicle to get something bigger was wrong—they returned it because it was "junk." Second, they argue Nexus failed to replace the queen-sized mattress with a king-sized mattress, change the upholstery color, and restore all original equipment as promised. Third, they argue that Nexus never performed a predelivery inspection. They contend that they never gave Wagon Trail permission to perform a predelivery inspection.

The Ormsbys received no written warranty. They relied on a predelivery inspection. It remains undisputed that a predelivery inspection was done. The issue seems to be whether Wagon Trail could perform the inspection. The Ormsbys together testified that a predelivery inspection would be conducted but never said Nexus identified who might complete that inspection. No evidence has been presented that would allow a reasonable juror to conclude that Nexus was precluded from arranging an inspection through Wagon Trail. The Ormsbys bargained for a predelivery inspection; they received one; they even received one from a company owned by friends of theirs; and the Ormsbys received the report of the inspection. The court thus grants summary judgment on this theory of breach of express warranty.

The Ormsbys never seem to argue this next point, but they also conducted a walkthrough with Rowley White and created a punchlist of repair items, albeit after the sale. This punchlist reflects Rowley White's understanding as to whether the dealer would fix the particular item or whether Nexus would— some repairs that reflect the same promises from Nexus back in October 2017 and that appeared on a change order form prepared internally by Nexus. That said, only a buyer can enforce an express warranty. *See* Ariz. Rev. Stat. § 47-2313(A)(1). On this record, no reasonable jury could conclude that the Ormsbys were buyers. Only Two J's was a buyer. Thus the court must grant summary judgment on any express warranty claim by the Ormsbys.

Two J's has argued that certain promises and affirmations of fact became the basis of its bargain— for instance, that Nexus would replace the queen-sized mattress with a king-sized mattress, change the upholstery color, and restore all original equipment. Nexus counters that its interactions with the Ormsbys on October 6, 2017 cannot be imputed on this record as the basis of the bargain with Two J's on January 20, 2018 (or when the company advanced the purchase funds to Rowley White beforehand on December 26, 2017).[6]

---

[6] Nexus also says the bill of sale sold the recreational vehicle "as is." Two J's argues that it (through Ms. Ormsby) crossed out the as-is language. Two J's argues that it rejected the as-is clause and that Rowley White's silence represents acceptance of a deal without it. If the unit was purchased "as is," a prior and contradictory oral promise

"Arizona, adopting UCC § 2-313, requires a measure of reliance" to establish that express warranties have become part of the basis of the bargain. *Bestwick*, 576 F. Supp.3d at 607-08; *see* Ariz. Rev. Stat. § 47-2313(A)(1) ("[a]ny affirmation of fact or promise . . . [that] becomes part of the basis of the bargain"); *see, e.g., Earle M. Jorgenson Co. v. Tesmer Mfg. Co.*, 459 P.2d 533, 536 (Ariz. Ct. App. 1969) (affirmation of fact "was clearly intended that [the buyer] should rely thereon and the [buyer] did rely thereon"); *see also Hix v. Bos. Sci. Corp.*, 2019 U.S. Dist. LEXIS 197384, 15 (D. Ariz. Nov. 14, 2019) (allegations that patient "relied" on medical company's representations sufficient to overcome motion to dismiss express warranty claim).

Though normally a question of fact, Two J's has not established that it relied on any representations that Nexus made to other prospective buyers (the Ormsbys), that the company knew of the promises to alter the recreational vehicle, or that the company agreed to purchase the unit because of these warranties. On this record, the Ormsbys decided not to buy the unit individually; and instead, they decided to finance its purchase through their son's company. Nothing has been presented that the company agreed to purchase the unit knowing about any of the prior representations or warranties. Nothing has been presented as to why the company agreed to purchase the unit. Instead, Two J's confirms in its sole member's affidavit that Ms. Ormsby had no general authority to act for the company—merely the authority to sign—so the court cannot even envision an argument that her knowledge somehow became that of Two J's, or that the basis of what might have become a deal with

could not be enforced, *see* Ariz. Rev. Stat. § 47-2202, absent mutual assent or acquiescence in its modification. *See Ancell v. Union Station Assocs.*, 803 P.2d 450, 454 (Ariz. Ct. App. 1990); *Nationwide Res. Corp. v. Massabni*, 658 P.2d 210, 216 (Ariz. Ct. App. 1982). The dealer testified that only its business partners had the authority to agree to such an alteration, and that no manager had such authority. The dealer testified it had no record that it had been so approved. Notwithstanding this seeming concern, on this record Ms. Ormsby crossed out "as is" on the bill of sale twice and while a Rowley White representative watched. She says she did so because the predelivery inspection had not yet been conducted. The dealer never objected to these revisions to the bill of sale. Instead, the dealer proceeded to close the deal. The dealer performed a walkthrough and then delivered the unit to Wagon Trail for the predelivery inspection. Rowley White even agreed to do small repairs. Rowley White later used the monies advanced from Two J's to pay down its floorplan financing debt to Nexus, or so a jury could reasonably infer. But even if these facts created a genuine issue as to this modification and Rowley White's acquiescence, it would not change the result today.

her and her husband, now unrealized, would automatically translate into the basis of the bargain with an entirely different buyer. Nexus is quite right that, even if Two J's ratified or frankly even approved her signature on the bill of sale, this mere fact does not mean that Nexus's old representations to different prospective buyers could be imputed as the basis of a new bargain with Two J's.[7] The court grants summary judgment on the express warranty claim accordingly.

D.    *Breach of Contract.*

Arizona recognizes a breach of contract action separate from express warranties. *See Flory*, 633 P.2d at 385 (plaintiff brought action under multiple theories, including breach of contract and breach of warranty); *Seekings*, 638 P.2d at 215 (recognizing both claims but prohibiting double recovery). No one has argued that the breach of contract and express warranty claims should merge. The "requirements of an enforceable contract are an offer, an acceptance, consideration and sufficient specification of terms so that the parties' obligations can be determined." *Flory*, 633 P.2d at 390. "To state a breach of contract claim, a plaintiff must allege that (1) a contract existed, (2) it was breached, and (3) the breach resulted in damages." *Steinberger v. McVey ex rel. Cnty. of Maricopa*, 318 P.3d 419, 434 (Ariz. Ct. App. 2014).

The Ormsbys and Two J's argue that Nexus breached its contract by failing to replace the queen-sized mattress with a king-sized mattress, change the upholstery, replace the desk with the sofa, and to restore the unit to its original condition.[8] Nexus argues that the parol evidence rule forecloses reference to promises the company made through Mr. Lint. *See Richards Dev. Co. v. Sligh*, 358 P.2d 329, 330 (Ariz. 1961) ("The parol evidence rule . . . excludes the use of parol evidence to add to, subtract from, vary or

---

[7] Accordingly, the court need not address the sham affidavit argument. Even if a genuine issue of fact exists as to whether Ms. Ormsby had authority to sign for Two J's, it would not change this result. Though the Ormsbys and Two J's often cast this deal as a purchase among "part owners," neither the bill of sale nor title for this unit support such a characterization for a reasonable jury. Whatever the financing deal between the Ormsbys and Two J's, that was their deal, not one that overrides a plain contract or title vis-à-vis this unit.

[8] The Ormsbys and Two J's also argue breach of contract on the failure to perform a predelivery inspection. For the reasons already stated, the court grants summary judgment on this breach theory.

contradict the terms of a complete and unambiguous written contract."). Nexus also reiterates its arguments as to the express warranty claim.

On the latter front, Nexus prevails. No reasonable jury could find that the Ormsbys had a contract with Nexus, so they cannot pursue a contract claim. They were not parties to the contract. And even if a question of fact exists as to whether Nexus authorized Rowley White to serve as a selling agent *for a deal with the Ormsbys*, this record presents no such reasonable finding for a jury to conclude that Nexus authorized Rowley White to serve as a selling agent *for a deal with Two J's. See supra* Section B. No evidence establishes that Two J's heard or relied on any statements from Nexus to decide to enter this deal or to authorize a company representative's signature. Indisputably Two J's had a contract with Rowley White, but this record does not permit a reasonable finding that Two J's had a deal with Nexus.

What's more, Two J's has not established that the terms it wants to say Nexus (through Rowley White) breached became terms of any contract. This contract claim arises from the very same promises that Two J's calls express warranties. "Under ordinary principles of contract law, a term is included in a contract only when the parties assent to that term. This mutual assent is based on the objective evidence, not the hidden intent of the parties." *Lerner v. Brettschneider*, 598 P.2d 515, 518 (Ariz. Ct. App. 1979). No evidence shows that Two J's assented to the terms that the Ormsbys may have separately contemplated, and no evidence shows that Nexus assented to these same terms (or that Rowley White did on its behalf) in a deal specific to Two J's. Whether the as-is clause in the bill of sale remains or not, no evidence has been presented to show that old promises to different prospective buyers became part of the contract with this new buyer.

In short, even if there is enough evidence for a reasonable jury to find that the as-is modifications were accepted; and even if a reasonable jury could find that Nexus authorized the dealer to act in consummating a sale with the Ormsbys; that same jury could not find that Nexus had a deal with Two

J's, or that the deal with Two J's included as part of the contract promises that had been made to other buyers foreign to the deal that was ultimately struck. The court thus grants summary judgment.

       E.     *Arizona Consumer Fraud Act (ACFA).*

The ACFA was enacted to "eliminate unlawful practices in merchant-consumer transactions." *State ex rel. Corbin v. Hovatter*, 698 P.2d 225, 226 (Ariz. Ct. App. 1985). The ACFA declares as an unlawful practice the "act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby." Ariz. Rev. Stat. § 44-1522(A). Two J's and the Ormsbys must prove "a false promise or misrepresentation made in connection with the sale or advertisement of merchandise and the hearer's consequent and proximate injury." *Dunlap*, 666 P.2d at 87. Nexus argues that Two J's never heard any allegedly false statements (many the basis for express warranty or contract claims) and that the Ormsbys suffered no injury when they never purchased the unit.

On this record, only the Ormsbys heard the allegedly false statements. The Ormsbys try to counter only Nexus's first point. The Ormsbys argue that Ms. Ormsby signed the bill of sale as Two J's' agent. Only the hearer of the misrepresentation can pursue an ACFA claim. On this record, the Ormsbys heard the allegedly false representations, not Two J's. Nothing shows that the Ormsbys held any position with Two J's when they heard the misrepresentations. Nothing shows that Two J's authorized the purchase of this recreational vehicle in reliance on the representations or in connection with the sale. Nothing shows that Two J's authorized Ms. Ormsby to sign the deal for the company in reliance on these representations or to act in such a way as to impute her knowledge to the company. On this record, Two J's decided to participate in this purchase without knowledge of Nexus's representations.

The Ormsbys cite two cases to support their ACFA claims. *Watts v. Medicis Pharm. Corp.*, 365 P.3d 944, 947 (Ariz. 2016), held that "the [ACFA] does not require a direct merchant-consumer transaction to support a patient's statutory claim against a drug manufacturer." Though direct merchant-consumer transactions aren't required under the ACFA, *Watts* still featured a consumer buyer relying on express promises made by the drug manufacturer—that is, the hearer relying on these statements. *Id.*

The other case, *Sullivan v. Pulte Home Corp.*, 290 P.3d 446, 448 (Ariz. Ct. App. 2012), *vacated in part on other grounds*, 306 P.3d 1, 4 (Ariz. 2013), and *overruled on other grounds by Sirrah Enters., LLC v. Wunderlich*, 399 P.3d 89, 93-94 (Ariz. 2017), featured two home sales—one from the original seller to the original buyer, and then a sale from the original buyer to subsequent purchaser. The ACFA "requires that the alleged misrepresentations or deceptive acts be made 'in connection with the sale or advertisement' of the home," and "[t]here was no 'sale' or transaction between [the original seller and the distant buyers]." *Id.* at 453. "Nor was there any contact between [them] until many years after the [subsequent buyers] purchased the home." *Id.* The court found that no misrepresentations were made by the original seller to the second buyers; though they relied on advertisements on the original seller's website, they were not enough with a sale between the two. *See id.* at 453-54.

*Watts* and *Sullivan* don't provide an escape hatch for the law's requirement that the hearer rely on misrepresentations in connection with a sale. The evidence may show that Ms. Ormsby was authorized to sign the bill of sale for Two J's. But no evidence shows that Two J's thereby relied on Nexus's representations. Two J's owner testified only that he made the decision to purchase the vehicle after a conversation with the Ormsbys, and no evidence shows that Nexus's misrepresentations were relayed to Two J's then. The Ormsbys advance no law to impute their knowledge fairly to the company. The court thus grants summary judgment on Two J's ACFA claim.

As for the Ormsbys, no response was offered to Nexus's argument that they suffered no injury. Under ACFA, "injury occurs when a consumer relies, even unreasonably." *Kuehn v. Stanley*, 91 P.3d 346,

352 (Ariz. Ct. App. 2004). Of course, this reliance must occur in connection with the sale. *See* Ariz. Rev. Stat. § 44-1522(A); *Bestwick*, 576 F. Supp.3d at 607-08. Without argument at this "put up or shut up moment in a lawsuit," *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008), the court grants summary judgment on the Ormsbys' ACFA claims too.

F.      *Common Law Fraud.*

Common law fraud in Arizona requires: "(1) a representation, (2) its falsity, (3) its materiality, (4) the speaker's knowledge of its falsity or ignorance of its truth, (5) the speaker's intent that the information should be acted upon by the hearer and in a manner reasonably contemplated, (6) the hearer's ignorance of the information's falsity, (7) the hearer's reliance on its truth, (8) the hearer's right to rely thereon, and (9) the hearer's consequent and proximate injury." *Taeger v. Cath. Fam. & Cmty. Servs.*, 995 P.2d 721, 730 (Ariz. Ct. App. 1999). The parties present the same arguments here as they did under the ACFA, and the court reaches the same conclusions, thereby granting summary judgment on the fraud claims.

CONCLUSION

It seems that in a desire to structure a unique deal to avoid taxes, the Ormsbys gained that benefit but lost the benefit of rights they might otherwise have enjoyed under the law as traditional buyers or as contracting parties who wisely put to paper their terms. Whatever deal they hoped to strike with Nexus or began to strike with Nexus, they chose not to consummate that deal. At the end of the day, Two J's remains as a buyer that might have claims against Rowley White, but not Nexus on this record. Accordingly, the court GRANTS the defendants' summary judgment motion [ECF 94] and DENIES AS MOOT Nexus's motion to exclude [ECF 102].

SO ORDERED.

March 16, 2023                                    *s/ Damon R. Leichty*
                                                 Judge, United States District Court